## Case No. 14,321.

### TYSON v. VIRGINIA & T. R. CO. et al.

[1 Hughes, 80; 4 Am. Law T. 223.] [1]

Circuit Court, W. D Virginia. Nov., 1871.

PARTIES—RAILROAD COMPANIES—CONSOLIDATION— SUIT TO RESTRAIN.

By an act of state legislation, four independent railroad companies were authorized to be consolidated into one company, with provisions looking to the rights of the stockholders of each. Under this act, formal consolidation was carried into effect, and the charter and the formal consolidation had remained unimpeached for more than a year. On a bill brought by an owner of five shares in one of the companies (who had purchased fifty additional shares after consolidation), against the president and directors of that company, praying injunctions, and also on motion for temporary restraining orders, *held*, that the bill must be dismissed for want of proper defendants, especially for not making the president and directors of the consolidated company defendants, and that the temporary restraining orders must be refused.

By an act of the general assembly of Virginia, passed the 17th of June, 1870, four several railroad companies. whose lines stretched from Norfolk, via Petersburg and Lynchburg, to Bristol and beyond, were authorized to consolidate themselves into one company, by the name of the Atlantic, Mississippi and Ohio Railroad Company, upon such terms as the stockholders of each company in general meeting might agree upon, but with no power to compel any stockholder in any divisional company to exchange his stock in such company for stock in the consolidated company. There was a provision that as to such divisional stock as its owners should refuse or fail to convert into consolidated stock, the divisional companies should retain their corporate existence, in the stockholders' meetings of which the consolidated company should vote upon stock which had been converted at a rate of one vote for each share. The conditions of the act of June 17, 1870, were complied with fully, and the consolidated company was formed in November, 1870. One of the companies so consolidated was the Virginia and Tennessee Railroad Company, whose line of road extended from Lynchburg to Bristol. The common president of all four of the companies, before consolidation, was William Mahone, and he remained president of such company afterwards, and was elected the president of the consolidated com-

pany. James E. Tyson, of Baltimore, was, before consolidation, owner of five shares of stock in the Virginia and Tennessee Company, and refused to convert them into the stock of the consolidated company. After the consolidation had been formally effected, he purchased additional fifty shares of the stock of the Virginia and Tennessee Company, from owners who had refused to convert them into shares of the consolidated company. On the 13th of November, 1871, he filed his bill in this court, making Mahone, as president of the Virginia and Tennessee Company, and his directors parties defendant, reciting the foregoing among other facts, charging that the charter of consolidation of June 17, 1870, was void, and conferred no legal authority or power upon Mahone or his directors; that the organization of the Atlantic, Mississippi and Ohio Company was illegal; that the use of the property of the Virginia and Tennessee Company in the interest and under the direction of the consolidated company was illegal; that said Mahone had become president of the Atlantic, Mississippi and Ohio Company, and as such, with the direction of that company, had executed a mortgage upon the property of the Virginia and Tennessee Company, and of the connected companies, and were then negotiating a sale of the bonds, for securing which such consolidated mortgage was given. The bill prayed that the act of consolidation, and the proceedings under it, should be declared void, and the deed of trust annulled and set aside; and, at this special term of the court, called to hear the complainant's motion after due notice, prayed for a temporary injunction restraining the said Mahone, president, and the directors of the Virginia and Tennessee Company from using the property of said company in the interests of the consolidated company, and from proceeding further with the sale of bonds under the consolidated mortgage, etc.

John Baldwin and John W. Daniel, for complainant.

James A. Jones, W. W. Crump, Robert W. Hughes, and James C. Taylor, Atty. Gen. of Virginia, for defendants.

Before BOND, Circuit Judge, and RIVES, District Judge.

BOND, Circuit Judge. The court has listened with great interest to the argument of counsel in this cause, and hesitates to express any opinion until it has had opportunity to examine the large number of authorities to which they have been referred. (The court here gave its reasons for thinking the Atlantic, Mississippi and Ohio Railroad should be a party.) Nevertheless so great pecuniary interests are involved in this suit, and the danger of loss to one of the parties, at least if the proper persons were made parties, would be so serious and immediate, that the court is inclined at once

to determine the motion before it without attempting to decide any of the other questions affecting complainant's rights, which have been elaborately argued, and which will be more directly before the court at the final hearing of the cause. What the court is now asked to do is to enjoin these new defendants, provided they are made parties, as they should be, by a preliminary injunction, from proceeding to execute any of the powers and franchises alleged to be granted to them by the act of June 17, 1870, pending the suit. This is to invoke the extraordinary power of this court, which ought not to be exercised unless the injury threatened the complainant be immediate, serious, and irreparable; and not then, if the damage to the defendants is likely to be greater than that of complainant, and equally immediate, serious, and irreparable. It seems to the court that the complainant has neither of these reasons for asking the court to exercise this power in his behalf. Whatever has been done by the defendants respecting the stock or property of the Virginia and Tennessee Railroad Company was done, or was contemplated to be done, twelve months before the complainant purchased his stock in the road, and the former owner of his shares was a participant in part of the proceedings which led to defendants' action. Complainant had full notice of what defendants were about to do, and if, under these circumstances, he purchased his stock in the Virginia and Tennessee Railroad Company, he voluntarily put his interest in jeopardy, and cannot call upon the court to exercise its extraordinary powers to protect him, pending a suit to determine his jeoparded rights, which had been in danger, if at all, twelve months before he voluntarily purchased them.

It is manifest to the court that the danger of loss to defendants in case the court should exercise the power invoked, if at the final hearing its judgment should be for defendants, is likely to be more serious and irreparable than any possible loss to complainant. Credit is a delicate thing. Confidence in the power and right of defendants to make the pledges they have made to raise the money authorized by the act of June 17, 1870, is absolutely necessary to the success of the loan. In this suit defendants have at stake millions of dollars, while the complainant, at the commencement of the action, had but five shares of stock, which he alleges in his bill are in immediate danger of depreciation in value by defendants' conduct, which danger was not great enough to prevent his purchasing fifty shares more since the suit began. Under these circumstances the court is of opinion that the complainant has no right to ask the court to exercise this extraordinary power. Whatever rights or interests the complainant may have are in no danger of great or irreparable loss. They may be fully determined and secured at the final hearing, without the aid

of a preliminary injunction, and the court will refuse the motion.

RIVES, District Judge. This cause cannot now be heard by us in the breadth and to the extent in which the pleadings and arguments of counsel have claimed our attention. The necessary parties are not here. We have no other parties before us but a solitary shareholder as complainant, and his company and its president as defendants. Nevertheless the rights, the acts, the lawful existence of another corporation, namely, the Atlantic, Mississippi and Ohio Railroad Company, have been the chief theme of discussion by counsel on both sides, and the principal topic of complaint on the part of the complainant. Yet this company has not been made a party by this bill, nor any officer thereof, in his character as such. The president of it is indeed a party, but wholly in his character as president of the Virginia and Tennessee Company, or else as an individual, uniting in himself the presidency of both companies, but nowhere in the bill called to account as the president of the consolidated company. The corporation, thus overlooked as a party in these proceedings, is a most important one in the legislation of the state, both as regards the magnitude of its enterprise, the amount of its capital, the munificence of the state towards it, and the policy which it established. It was created as a means of uniting in one organization four distinct lines of railroads, having one common object of attracting to our seaboard the trade of the West. Its claims and rights, therefore, cannot be impleaded in a controversy confined to one of these four companies, and a member of it. The great object of this suit is to assail the validity of the charter of the Atlantic, Mississippi and Ohio Railroad Company, of a large loan recently effected by its president, and of a mortgage to secure it, and, further still, to arrest and defeat the negotiation and sale of the bonds of the company, based upon this mortgage. And the only pretext offered for this by the bill consists of the allegation that all this proceeds from the acts of William Mahone, the president of the Virginia and Tennessee Company, and, as such, constituting a breach of trust towards the complainant. But the mortgage, when exhibited in this cause, is shown not to proceed from William Mahone, as president of the Virginia and Tennessee Company, but from William Mahone, as president of the Atlantic, Mississippi and Ohio Company. It purports on its face to be a deed of this company alone. It would, therefore, be out of the power of this court, under the state of parties, to adjudicate the questions raised in argument, or to grant an injunction calculated to restrain a corporation or its officers who are strangers to this suit.

This defect is patent. It is sufficient to justify a refusal of the preliminary injunction asked for. Nevertheless it has not been availed of by the able counsel for the defendant. They have vied with the counsel on the other side in the elaborate presentation of the vital questions growing out of the act of June 17, 1870. This defect can be readily cured by amendment, and with opinions already matured upon the instructive arguments we have heard, we may incur the repetition of the discussion, and be more regularly required to decide the issues that have been made before us. Without prejudice, therefore, to any future rehearing of the cause, when more regularly matured, I seem invited, by the course of counsel, at this time to indicate my conclusions from the learned and protracted debate we have heard. In an inferior court like this it may be of use in shaping the course of counsel, and narrowing the scope of their inquiries. Great public interests are also at stake in this litigation, and any opinions from the bench that may have the effect of composing this strife, disembarrassing a great public work of suits, and defining the rights of private corporators connected therewith, are not improper on an occasion like this, but, on the contrary, calculated to subserve a good end. Under this impression, I proceed to give briefly the opinions to which I have been led by a careful consideration of the topics that have been so ably discussed before the court.

The chief reclamation in this cause, the gravamen of the complaint, is, that the act of June 17, 1870, commonly called the "Act of Consolidation," operated a diversion of plaintiff's shares, profits, and franchises from the object to which they were pledged by his charter, to a different enterprise, in which he was not bound nor willing to embark. From the numerous authorities that have been cited to us I deduce this leading principle—that a charter involves two contracts: First, on the part of the state, as to the nature and limits of its grants; second, as between the corporators themselves, binding them collectively and singly by its terms. The perpetual obligation of the first was affirmed in the great Dartmouth College Case. That decision has not been impugned, nor its authority shaken, by the prevailing spirit of change and progress. On the contrary, it has led to the now common reservation in charters, of the power to repeal, alter, or amend. In our general act of 1837 it takes the form of a privilege to modify, alter, or amend, so far as not to affect the rights of property. This legislative reservation clearly pertains to the first contract. The second one existing between the corporators is without its purview, because that is protected by a constitutional guarantee, which forbids its impairment by the state, either in the form of law or constitution. Hence I infer that any law which enters within the pale of a charter, and violates the contract subsisting between the corporators, by committing them

or diverting their assets to any new work not embraced by their charter, is void, because subversive of the contract between themselves, and therefore obnoxious to the constitutional restriction. In such a case restraint by writ of injunction is appropriate, because it secures to a dissentient stockholder his full measure of protection under the constitution, both state and federal. Any such abuse of the charter may also. be corrected by the judicial application of the doctrine of "ultra vires." From this reasoning, therefore, it follows that the legislature cannot avail of this reserved power to free people of the obligation of their contracts. All it is intended for is to allow succeeding legislatures to limit, alter, or modify previous grants by the state of its public franchises, and can of necessity have no operation upon the interior contract existing in the body of the charter between its members.

Does the act of June 17, 1870, militate against the principles thus announced? Does it infringe, alter, or pervert the rights of the shareholders in the original companies having severally charge of this continuous railway through the state? Does it consolidate these companies against the will of even a minority of the stockholders? The fundamental provision of this act gives the negative to these questions. In the first, leading section of the act, no one share of the original pre-existing companies can be subscribed to or merged in the stock of the new company, or otherwise acquired by it, except upon the agreement of the shareholder. With this distinct and unqualified stipulation before us, we are challenged with a bare parenthetical implication, growing out of the eighth section, to the effect that these pre-existing companies are to be extinct upon their abandonment by a majority of the stockholders in each. This is but a cursory implication. How, it came to be made, or with what purpose it was expressed, whether by way of inducement, suggestion, or coercion, is scarcely worthy of inquiry in my view; it is reprobated by the whole structure of the law. Though termed an act of consolidation, it does not of itself operate as such. It stamps on its frontlet and recognizes to its extremest limit the right of each and every stockholder in the pre-existing companies, and actually preserves their organization so long as there are any to cling to them. True, it does not make ultimate provision for the case of stockholders who may not choose to cast their shares into the new concern. In other states, it seems, provision is made for ascertaining by commission the value of such shares, and providing for their ademption by the payment of such values. This ulterior arrangement was doubtless not made by this act, because of the confidence entertained by the legislature that in view of the great liberality of the state in the endowment of this new company, and the attractive policy and advantages of its charter, everything necessary or desirable would best be accomplished by treaty and agreement between the companies and private stockholders, whose interests were so perfectly akin to each other. At any rate, the dissentient stockholder is safe under the provisions of this act. Nothing can be done with his share or franchise without his assent. It is "so nominated in the bond." If he has not been fairly dealt with in the past, he has rights of contract by common law; he can enforce them at law or in equity, as he may choose to assert his claim. It is the manifest interest of all, and especially the duty of the great, overshadowing corporation —the Atlantic, Mississippi and Ohio Company—to seek and effect an early settlement with all and each of the shareholders in the original, outlying, and now nearly extinct companies, so as to be able to prosecute, with unity of effort and design, their important undertaking under one charter, and under the cheering auspices of a contented public, and a scrupulous regard for the rights of all who have had a share, however small, in these works. But if, perchance, injury has been done or is apprehended by dissentient stockholders, it does not present a case for injunction; it can be adequately redressed by damages ; they can always demand and have a fair and just account of their corporate assets, and full satisfaction for their stock. But the action now asked against this company is a far different case. If you now arrest them in the negotiation of their loans, you give a fatal, incurable stab to their credit and works. An injunction against them at this time would be an irreparable injury. The apprehension of it at any future time, and in a perfected state of the pleadings, is so grave a matter as, in my opinion, to require the intimation now thrown out to counsel, that they are not likely hereafter, when they have been made proper parties to their bill, to get this court to intervene in this form of a preliminary injunction.

The view I have thus taken of the charter of the Atlantic, Mississippi and Ohio Company frees it of the constitutional objections urged against its validity. I have but little doubt these objections were present to the minds of the framers of this law when they drafted it. They have accordingly steered clear of them. It was not enforced consolidation. It was not a diversion of corporate property or franchises to a new undertaking not in the terms or contemplation of the original charter. It was a tentative measure toward consolidation. Its success all rested on the voluntary action of the stockholders of the separate companies. The state set the example of transferring its shares and bonds to the new company for a moderate consideration, and upon terms of long and generous indulgence. This example, combined with obvious considerations of private interest and public policy, was reasonably counted on as means to lead the private stockholders out of the old companies into the new all-embracing

company, and thus to bring about the final abandonment of the old antagonizing charters for the one common harmonizing charter for all. Nor has the event disappointed this reliance. We are told that nearly all of the individual stockholders in three of these companies, and upwards of 8.000 out of 12,000 in the Virginia and Tennessee. have taken refuge under the late comprehensive charter of June 17, 1870. Doubtless this process of transfer is still going on, and will continue to go on. Until it is completed in the way designed by law, the courts will be open to adjust and liquidate the claims of all dissentient stockholders. In this very case, the bill may be amended and prosecuted as an original one, to give the complainant the benefit of any accounts he may choose to call for, and the relief to which he may show himself entitled. The concession is due to the minority of stockholders, however small. Their rights are to be respected. However obstinate they may be in resisting overtures to subscribe their stock to the new company, no one, under the terms of this act, can demand a reason of them. "Voluntas stat pro ratione." But I would not be understood as precluding the courts, on a proper case made, from interposing their rightful authority to settle these obstructing claims, and to remove out of the way a grand improvement ordained by the legislative will, rights unreasonably withheld, and admitting of just and full compensation.

While I thus state the case, and construe the rights of the minority, I must add that the majority have rights equally clear and indisputable, and among these I reckon the right to abandon and forsake their separate charters, and betake themselves to a common one more to their liking. The mode of exercising this right has been appointed by the act of June 17, 1870. That is essentially the aim, the scope, the effect, the operation of this act. It does nothing more. It is permissive, not mandatory. As the means, therefore, of accomplishing in the given emergency a public policy agreeable to the legislature, and promotive of that unity and harmony which it aimed to introduce in the conduct and completion of this work, I am free to say that I can conceive of no measure to this end less liable to constitutional objections than the act in question. I cannot, therefore, refrain from imparting at this stage of the proceedings these my strong convictions to the counsel, whose opposing views on this subject I have studiously considered and patiently weighed. As they have on both sides discussed these questions, I shall not, I hope, be accused of rashly prejudging them. But at the same time, I beg to assure them of my readiness to reopen the discussion at any future stage of this cause, when fully matured as to all proper parties, and invoke their assistance in a review of these opinions, with a full purpose on my part to discard the bias of all preconceived opinions as becoming the bench, where the pride of opinion should always yield to better thought, more patient investigation. and, above all, to the honest and brave pursuit of truth and justice.